## Case No. 1,861.

### The BRIDGEPORT.

[7 Blatchf. 361.][1]

Circuit Court, E. D. New York. June 18, 1870.[2]

COLLISION — PRESUMPTION OF FAULT — PROOF—
STEAMER AND VESSEL AT PIER—FOG.

1. In the absence of any proof other than the mere fact that one vessel collides with another, no presumption of fault arises against either vessel; but the circumstances may be such that, on proof of the situation of the injured vessel, the other is put to proof of due care, caution and skill on her part.

[See note at end of case.]

2. When a steamboat runs into or against a wharf in a port or a vessel moored thereto, there is a presumption of negligence on her part; and, unless she satisfactorily establishes an excuse, she will be held in fault. Such excuse held not to be established in this case.

[Cited in The Echo, 19 Fed. 454.]
[See The Helen R. Cooper, Case No. 6,334.]

3. The steamboat held to have changed her course too soon in a fog, in the night, and to have run at too great speed in such fog.

[Cited in Ellis v. The Katy Wise, Case No. 4,404.]

[Appeal from the district court of the United States for the southern district of New York.

[In admiralty. Libel by George Shaw against the steamer Bridgeport, Charles Weeks, and Robert Haydock, claimants, for damages caused by collision. There was a decree for libellant in the district court (Case No. 12,717), and claimants appeal. Affirmed.]

Daniel D. Lord, for libellant.
Edward H. Owen, for claimants.

WOODRUFF, Circuit Judge. The liability of the steamboat in this case depends solely upon the question of fact, whether she was navigated in the exercise of reasonable care and caution under the circumstances, and with due nautical skill. Without entering upon a discussion of the testimony in detail, I am constrained to say, after a careful examination of all the evidence, that the proof is against her in this respect.

While it is no doubt true, that, in the absence of any proof other than the mere fact that one vessel collides with another, no presumption of fault arises against either vessel, it is also true, that the circumstances may be such that, on proof of the situation of the injured vessel, the other is put to proof of due care, caution and skill on her part. Here, the vessel of the libellants was moored to a wharf or bulkhead, and some twenty-five or thirty-five feet from its outer extremity. The steamboat ran nearly head

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Affirming decree of district court in Shaw v. The Bridgeport, Case No. 12,717. This decree was affirmed by the supreme court in The Bridgeport v. Shaw, 14 Wall. (81 U. S.) 116.]

on against her side, at a point two-thirds of her length inward from her outer end. It is impossible to say, that, when a steamboat runs into or against the wharves of the port or vessels moored thereto, there is no presumption of negligence or want of skill on her part. On the contrary, a vessel thus lying and so run into may rely on proof of those facts, and put the steamboat to her excuse, and. unless such excuse is satisfactorily established, the latter must be held liable.

The alleged excuse here is, that the collision was an inevitable accident, which, as claimed on behalf of the steamboat, means, that she was pursuing a lawful avocation, in a lawful manner, and in the exercise of ordinary skill and, caution, but that, by reason of the fog in which she was enveloped, the state of the tide, the obstacles to coming to anchor, and the necessity of maintaining her head-way, this ordinary skill and caution were unavailing. Without criticizing the legal proposition involved in this claim, it must suffice to say, that, to my mind, the proofs show that such skill and caution were not observed.

It can hardly be necessary here to repeat what has been so often held, that ordinary care and caution and due nautical skill are not absolute terms. They are relative, and depend, in a high degree, upon the circumstances which invoke their exercise. Due care and caution are what are reasonable in the condition in which the vessel is placed. What is ordinary and is reasonable in the conduct of a steamboat in an open sea, or in a pathway where there is no just cause to apprehend danger to herself or to others, may be great imprudence, and even recklessness, in a place or under circumstances in which error or mistake would probably be destructive to herself and to other vessels whose proximity might reasonably be expected.

The course of the steamboat on the night in question required her to change her direction, after she had passed Corlears Hook, three or four points to the westward. She was entirely familiar with the location. She knew the situation of the wharves, slips and bulkheads at that place. She knew the places of the neighboring ferries, and just how far below the ferry nearest the Hook it would be proper to change her course to the westward, to proceed in safety. The width and direction of the river at that place, and the situation of the injured vessel, in connection with the manner in which the latter was struck, show conclusively, that the steamboat changed her course too soon, and at a point several hundred feet above the place where she ought to have changed, and that this mistake brought her directly towards the wharf and into the libellant's vessel. She alleges that she had been suddenly enveloped in a fog, which rendered it impossible to see where she was or where she was going; and that she supposed she was in the middle of the river, and had reached the proper place to turn. She was not justified in either conclusion; and, without denying that an error in judgment is not necessarily a fault, such an error as plainly shows either want of reasonable nautical skill or want of care and attention in its exercise, is a fault. In such case, mere sincerity of belief or honesty of opinion is of no avail. The mistake in judgment which is not accounted a fault, is one which happens notwithstanding reasonable care, caution and skill are in full exercise.

On the night in question, and in a fog which, according to the witnesses for the claimants, prevented their seeing more than fifty feet ahead, and had suddenly enveloped the boat when in the near neighborhood of ferries, docks, and wharves with vessels moored thereto, she maintained a speed of from three to four miles an hour. True, her witnesses speak of this as barely keeping up steerage way. But in this they are mistaken, according to other facts to which they testify with entire distinctness. In the first place, that rate of speed is not essential to enable the pilot of a steamboat to direct her course even in still water. But, here, the boat was meeting a strong flood tide, and she could have been steered against it, if her actual motion over the land had been reduced far below the rate mentioned. The whole rate of the flood is to be added to her actual rate of progress, in determining whether she had motion in the water sufficient to amount to steerage way.

She was too near the New York shore. Now, although, in the deposition produced in this court, the pilot testifies, that, when he made the turn which produced the accident, he thought she was in the middle of the river, his testimony is unsatisfactory, for two reasons—first, that, in the face of other evidence, it is not entitled to full credit; and, second, that, if true, he was not justified in his belief, and reasonable care and skill would have informed him that he was not in that position. On the trial in the district court, several of the claimants' witnesses, and I think, the pilot himself, testified to their having been near the New York shore, in terms which indicates that they were then aware of that fact. They had just seen and passed the Grand-street ferry, recognized it, and seen the lights and heard the bell, and, although they could not, they say, estimate the distance they were from those lights, they knew that, by reason of their greater distance from the other shore, they neither saw the ferry lights nor heard the bell upon that shore. Not only so, but both pilot and lookout saw, after passing the ferry, and when in still nearer danger of running into the wharf, another light on the shore on the New York side, and then knew or believed it to be on that shore. Under these circumstances, in such a fog,

the boat not only was too near the New York wharves, but the pilot and men knew it, or ought to have known it. Besides this, the pilot knew his exact position when, not more than half a mile above the Hook, he entered the fog; and, if he had a proper compass and skill to use it, in a straight channel, nearly half a mile wide, he could have maintained a line of progress near the middle, as he should have done.

The steamboat turned, in order to take her course below the Hook, too soon, and her pilot ought to have known it. It is quite true, that, in a fog, and breasting a strong tide, when no permanent objects are visible, the pilot might be justified in an error, in estimating the speed and progress of his boat over a considerable distance. But, here, he saw the Grand-street ferry lights when abreast of them, they were about seven hundred feet above the wharf at which the injured vessel lay, and that wharf projected further into the river than the ferry wharves or the bulkhead first below them. All this the pilot must be taken to have known; and yet it is clear, that, within twice the length of his boat after passing those lights, he made the turn. No other hypothesis, consistent with the testimony of the pilot and the other witnesses on the boat, will account for the collision in the manner and direction in which it occurred. Indeed, one of the witnesses says, she commenced turning when opposite those lights. Such a mistake cannot be excused by mere sincerity of purpose or honesty of intention. At and below that place the river was wide. There was no difficulty in the pilot's continuing on in the line of his course, at a slow speed, till admonished by feeling the eddy, or, better, by seeing the lights on the Williamsburg side, that he was safe in turning.

If, in either of the particulars mentioned, there were doubt of the fault of the steamboat—and I am quite aware that there is testimony in conflict with some of them—I might still say, that there are some blunders shown to be such by their very result, whether the particular or specific fault can be detected or not; and the running of this steamboat into the vessel, at a point so far from the end of the wharf at which she lay, seems to me of that character, and to require explanations much more free from criticism than are here given, to excuse it.

The items allowed by the commissioner for the damages sustained are, I think, in conformity with the clear preponderance of the evidence. The estimates of Poillon and McVey, the witnesses for the claimants, undoubtedly called for close scrutiny of the case in this respect made by the libellant, and warranted a suspicion that the occasion had been taken to make more extensive repairs than were rendered necessary by the collision. But, on careful examination, I am satisfied that I cannot so find without impeaching the veracity of witnesses who had a better and more complete opportunity to know, by witnessing and superintending the work actually done, how far it was called for by the injury, and who are not otherwise shown to be unworthy of confidence.

The decree must be affirmed. 1 Ben. 65 [Shaw v. The Bridgeport, Case No. 12,717].

[NOTE. Affirmed by the supreme court on the ground that the fault lay with the steamer. In delivering the opinion of the court, Mr. Justice Bradley stated: "The point where the Margaret Evans was struck by the steamer was over two hundred feet outside of the open channel or passageway for vessels, and three or four hundred feet from the track which the steamer ought to have pursued. The latter had got that much out of her way in one and a half or two minutes, whilst running not more than five or six hundred feet. It seems almost impossible that she could have gone so far astray in so short a time, with points of observation so near at hand, without great want of skill, or great inattention to the compass and other indicia of course and position. When off the Grand-street ferry, her officers must have known nearly her precise position in the river. Her deviation from the channel seems utterly inexcusable. The only excuse which her officers proffer is that it was so dark they could not see. and they supposed they were far enough off from shore, and far enough advanced, to change their course for rounding the Hook." And, on the contention that the ship was in fault in not having a light and a proper watch, the learned justice continued: "An attempt is made, indeed, to throw the blame on the Margaret Evans herself, because she did not have a light, and because she had no anchor watch. The fact is she had a night watchman on board, and, as to a light, we think it is hardly necessary for a vessel lying at a wharf, more than two hundred feet outside of the channel, to anticipate the visit of stray steamboats in the nighttime, and to make provision for such an exigency." The Bridgeport v. Shaw, 14 Wall. (81 U. S.) 116.]